(C. D. 1607)

THE CROSSE & BLACKWELL COMPANY v. UNITED STATES

United States Customs Court, Third Division

*Tompkins & Tompkins (Allerton deC. Tompkins of counsel) for the plaintiff. Warren E. Burger, Assistant Attorney General (Harold L. Grossman, trial attorney), for the defendant.*

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: This is a protest against the collector's assessment of duty on canned beef stew, imported from Canada on or about June 3, 1951, at 25 per centum ad valorem under paragraph 775 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T. D. 52373, and the President's proclamation of May 13, 1950, T. D. 52476, under the provision for hash, or similar forms, composed of vegetables and meat, not specially provided for. Various claims are made in the protest but those relied on are that the merchandise is dutiable under the provision in paragraph 775, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, for "soups, soup rolls, soup tablets, or cubes, and other soup preparations," composed of vegetables and meat, at 17½ per centum ad valorem, or, in the alternative, under paragraph 1558 as a nonenumerated manufactured article at 20 per centum ad valorem. In addition, it is claimed in the brief that classification should be made under the provision of paragraph 775 for soups or soup preparations, either directly or by similitude by virtue of paragraph 1559.

The pertinent provisions of the tariff act and its modifications are as follows:

PAR. 775 [as modified by T. D. 52373 and T. D. 52476]. Pastes, balls, puddings, hash (except corned-beef hash), and all similar forms, composed of vegetables, or of vegetables and meat or fish, or both, not specially provided for, 25% ad val.

PAR. 775 [as modified by T. D. 51802]. * * * soups, soup rolls, soup tablets or cubes, and other soup preparations, composed of vegetables, or of vegetables and meat or fish, or both, not specially provided for, 17½% ad val.

PAR. 1558 [Tariff Act of 1930]. That there shall be levied, collected, and paid on * * * all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1559 [Tariff Act of 1930]. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *.

At the trial, plaintiff called three witnesses and produced a number of exhibits.

Jack P. Seldon, export-import manager of The Crosse & Blackwell Company, the plaintiff herein, stated that he was familiar with the imported merchandise and produced four cans thereof, which were received in evidence as plaintiff's collective exhibit 1. The labels on the cans state, among other things:

STEWS

PRODUCT OF CANADA

*Varieties* . LAMB STEW . BEEF STEW

IRISH STEW     CORNED BEEF HASH

DIRECTIONS

Place contents of can in open pan and stir while heating.

MEAT PIE

Pour one can, or more if desired, of C & B Stew into a well greased baking dish. Place carefully over the top a rich, flaky pie crust. Bake in a moderate oven. This provides a delicious "one-dish meal," labor-saving and nourishing.

Harold D. Barry, a chemist, testified that at the time of the trial he was employed in the research and development section of the plaintiff's Baltimore plant, but that he had previously been chief chemist and production supervisor of the company's Canadian plant. He had at different times in the past been connected with the National Research Council of the Canadian Government in Ottawa, with McLaren's, Ltd., a canned food company, and with the Ontario Research Foundation. He stated that he had had actual supervision of the production of the stew involved herein and described the process as follows: The ingredients consist of beef, 25 percent; potatoes, 20 percent; carrots, 5 percent; peas, 5 percent; onions, 5 percent; tomato puree, 2½ percent; other ingredients, such as celery, flour, beef extract, flavoring, and spices, 5 percent; and the balance water. Mr. Barry explained that these percentages were figured prior to cooking and that after cooking the meat weighs less and represents about 17 percent of the weight of the merchandise. He was unable to give the other percentages after cooking. To produce a stew, the vegetables are cut and cooked with the flour, tomato puree, and spices, by boiling and simmering in a large kettle, from which the material is pumped into an Ayres soup filler. The meat is diced, cooked, and boiled separately, and the fixed percentage placed in each can. A fixed portion of the material in the soup filler is added and the can is filled with boiling water. It is sealed and steamed for 2 hours at a temperature of 240 degrees Fahrenheit.

After the processing was completed, the witness customarily opened some of the cans and examined their contents. He stated

that what he saw was meat, vegetables, and sauce in a thickened mass. Neither the meat nor the vegetables had disintegrated, but the sauce had penetrated into both.

There were introduced into evidence four cans of Campbell's condensed beef soup (plaintiff's collective illustrative exhibit 2), which Mr. Barry believed, on the basis of visual observation, to be similar to the beef stew involved herein, and four cans of Libby's corned beef hash (plaintiff's collective illustrative exhibit 4).

Mr. Barry stated that he had never produced nor supervised the production of hash, but that he had observed the process often and described it as follows: Hash consists of potatoes and meat with some spicing in it. The meat is cooked by boiling it in water with a chemical, sodium nitrite, to corn it. The potatoes are peeled, diced, chopped, and blanched (partially cooked) by a boiling or simmering process. Then, the meat, potatoes, and spices are put in a Buffalo chopper and chopped together until the material has the consistency of a paste. No water is added. The material is placed in cans, which are sealed and heated in a retort with steam to a certain temperature, and that temperature is maintained for a certain length of time. Mr. Barry did not consider the process stewing because the flavors were not dispersed through the product as a result. He said the hash was a meat-potato product, not flavored by tomato puree and vegetables.

The witness referred to certain "Regulations Governing the Meat Inspection of the United States Department of Agriculture," a copy of which was marked as plaintiff's exhibit 3 for identification. Mr. Barry stated that these required stew to contain not less than 25 percent meat, computed on the weight of the fresh meat, and hash to contain not less than 35 percent meat. (According to 9 Code of Federal Regulations § 17.8 (29), the latter is based on the weight of the cooked and trimmed meat.)

Mr. Barry testified that condensed vegetable beef soup and beef stew are composed of the same materials and are produced generally in the same way. In flavor, they are similar. In thickness, they are dissimilar as canned, but not as used, because the condensed soup is diluted with an equal amount of water before being eaten as a soup. A soup can be prepared from a stew by adding water, resulting in a thicker than normal soup. A stew is a more expensive product than a soup because it contains a greater percentage of meat.

Mr. Barry stated that he had prepared condensed soup by placing the contents of the can in a saucepan, adding a can of water, and simmering to a boiling point. When he made the beef stew, he did not add water. However, in making a meat pie from the beef stew, he added water to thin it to the consistency he personally desired, although the directions did not call for the addition of water.

Mr. Edmund Charles, a chef, testified that he was at the time of trial employed by Crosse & Blackwell at its Baltimore plant and had previously been a chef or assistant chef at the Chesapeake Club in Baltimore and at hotels in various cities. He stated that his present duties include the preparation of soups, stews, hash, and fruit cake at the plaintiff's Baltimore plant. He described the process of preparing vegetable soup as follows: Beef stock, tomato paste, spice extract, and meat extract are placed in a kettle; then the raw vegetables, which have been peeled and cleaned, and in some cases diced, are added. Then, a thickening agent, frozen vegetables, and diced beef are put in. Water is added and the mixture is cooked. In a batch of 1,000 pounds, 150 pounds consist of stock, 600 pounds of vegetables or vegetable substances, and 250 pounds of water. According to Mr. Charles, the same processes are used in producing stew.

Plaintiff introduced into evidence four cans of Crosse & Blackwell corned beef hash (plaintiff's collective illustrative exhibit 5), and Mr. Charles testified that the product was prepared as follows: Fresh beef is cooked with water and sodium nitrite for a half hour. It is then weighed and chopped. The vegetables and potatoes, which have been peeled, washed, and steamed for 4 minutes, are diced. Then, the chopped meat and potatoes are put into a Buffalo mixer, spices and chopped onions are added, and the ingredients mixed together. The material is placed in cans, which are sealed and processed.

The witness opened a can of stew from plaintiff's collective exhibit 1, a can of soup from plaintiff's collective illustrative exhibit 2, and one can of hash each from plaintiff's collective illustrative exhibits 4 and 5. He stated that the stew and the soup contained the same ingredients, but that the pieces of meat and vegetables in the stew were larger than those in the soup, and the stew contained no barley. The stew was in a more liquid condition than the soup. In his opinion, there is very little difference between a stew and a soup. While stew is thicker, it could be regarded as a kind of soup. In a thickened condition, it is used as an entree, but it could be thinned and served as a soup. The witness did not regard hash as a kind of stew, because the ingredients are different and the products are prepared and served differently. Stew is heated in a saucepan and served in a bowl, while hash is heated in a frying pan or baking dish and served on a platter or plate. Beef stew can be served by itself as a complete meal, but since hash contains only meat and potatoes, a vegetable or a salad is served with it. In his experience, hash is not served as a soup, but stew can be. He has never used beef stew as a soup, but he has seen cooks in hotels or restaurants make a soup out of it. He added that while beef soup is intended for consumption in liquid form, it is sometimes baked or stewed with leftover meat.

Defendant offered in evidence a report of the United States Customs Laboratory, stating that the merchandise involved herein contained meat, 15 percent, vegetables, 45 percent, and liquid, 40 percent. (Defendant's exhibit A.)

It was agreed at the trial that the court might open any of the cans in plaintiff's collective exhibit 1 and in plaintiff's collective illustrative exhibits 2, 4, and 5 for use in the determination of the case. Accordingly, we have opened certain cans and have examined the contents thereof.

The first question to be considered is whether the imported merchandise is classifiable under the provision in paragraph 775 for pastes, balls, puddings, hash, and similar forms, composed of vegetables and meat. Each of the enumerated items is a coherent mass, consisting of ingredients which have been chopped up and so mixed together that they cannot be readily separated. The provision under consideration also covers "all *similar* forms," but does not, by its terms, include every form or combination of vegetables, or vegetables and meat or fish. Where specific or definite words are followed by general terms, the latter are to be regarded as referring to things of a like kind with those mentioned specifically. *Merck & Co. (Inc.)* v. *United States*, 19 C. C. P. A. (Customs) 16, T. D. 44852; *United States* v. *J. L. Hudson Co.*, 23 C. C. P. A. (Customs) 313, T. D. 48177; *P. Silverman & Son* v. *United States*, 32 C. C. P. A. (Customs) 99, C. A. D. 292. Note, in this connection, *Columbo Co., Antonino Badalament* v. *United States*, 21 C. C. P. A. (Customs) 302, T. D. 46819, wherein the court, in construing the term "pastes" in paragraph 775, stated (p. 306):

We are of opinion that, in order to ascertain the meaning and scope of the term "pastes" contained in paragraph 775, the rule of *noscitur a sociis* should be applied, and that giving consideration to that rule of interpretation, and to the legislative history of the provisions in question, it was intended by the Congress to include within that term finished, or substantially finished, food preparations, not mere materials which are used, together with other materials, in the manufacture of such preparations.

As examples of products intended to be covered by the term "pastes," the following articles may be mentioned: Finely ground lobster "in the form of paste, with a small percentage of potato flour * * * 'chicken, ham, and tongue,' 'chicken and ham,' 'turkey and tongue,' and 'ham and tongue.' * * * in the form of paste with a small percentage of potato flour and spices for flavorin purposes." *United States* v. *Richardson*, 13 Ct. Cust. Appls. 280, T. D. 41214.

While the article before us is a finished food preparation, it is not in similar form to the "pastes" mentioned by the court.

There are two cases, however, where the courts seem to have reached a different conclusion. *S. Hata Shoten* v. *United States*, 60 Treas. Dec. 346, T. D. 45097; *Pacific Trading Co.* v. *United States*, 22 C. C.

P. A. (Customs) 88, T. D. 47078.   Both of these cases involved canned merchandise, consisting of beef, bamboo sprouts, and gravy.   In the case first cited, the product is described as:

> * * * meat in various sizes from 1½ inches or 2 inches in length by 1 inch in width down to smaller pieces, some of which are less than 1 inch in size, the thickness in general being about one-fourth inch, together with pieces of sliced vegetables which are about one-fourth inch in thickness and range in length from 2 inches down to perhaps three-fourths inch, these pieces of vegetables being pieces of bamboo sprouts.   These pieces of meat and vegetables are entirely separate from one another, and they are immersed in rather thin gravy of light brown color which taken alone would probably fill about one-fourth of the can.

The plaintiff there contended that the merchandise was not similar to hash because the meat was not chopped sufficiently fine, but the court stated that the classification should not depend upon the size of the pieces of meat and held that the merchandise was similar to hash.

*Pacific Trading Co.* v. *United States, supra,* involved the same type of merchandise.   The court, in its opinion, referred to definitions of hash as meat and vegetables chopped into small pieces and mixed, and a statement in the Summary of Tariff Information, 1921, page 802, to the effect that paragraph 773, Tariff Act of 1922 (predecessor to paragraph 775, Tariff Act of 1930), provides for "fancy food preparations of vegetables or of vegetables mixed with meat or fish."   The court held that the merchandise was in a form similar to hash, stating (p. 90):

> We are in accord with the view of the trial court that the involved merchandise was properly classified by the collector.   The meat and vegetables of which it is composed may be in somewhat larger pieces, and it may contain somewhat more moisture, than is usually contained in "hash," nevertheless, it so nearly approaches the meaning of that term, as defined by the lexicographers, as, in our opinion, to be at least similar in form within the meaning of the statute.   It would be difficult to conceive of any "fancy food" product being in a form similar to hash, if the involved merchandise is not.

Both of these decisions rest upon the proposition that classification as hash or a similar form should not depend upon the size of the pieces of meat and   vegetables in the finished product.   The record in the instant case points out other differences between hash and stew: Hash is a paste, while stew is not.   Stew contains more kinds of vegetables than hash.   Hash is a conglomerate mass, but the ingredients in stew can be separated and identified, and the pieces therein are larger.   Hash is in a dry condition, while stew contains a liquid.   The two products are prepared and served differently; one is a complete meal and one is not.   In our view, therefore, the imported beef stew is not hash, or a similar form, and is not properly classifiable under the provision in paragraph 775 for such articles.

The next point to be determined is whether the merchandise may be classified under the provision in paragraph 775 for soups or soup preparations, either directly or by similitude.

Stew is certainly a different article of food from soup. There is some evidence in the record that a soup could be made from the imported beef stew by adding water, but, as the directions on the label indicate, it was not intended to be used in that way. The only evidence that beef stew actually was used in that manner is Mr. Charles' statement that he had seen cooks in hotels or restaurants make soup out of stew. There is also testimony that leftover meat or vegetables might be added to soup and the mixture baked or stewed, but there is nothing in the record to indicate that that is a common usage. Beef stew is ordinarily prepared without the addition of water and is served as an entree. Condensed soup is prepared by adding water and is served prior to the main meal.

Beef stew is, therefore, not a soup or a preparation from which soup is made. Nor do we think it is similar to condensed soup in material, quality, texture, or use. Most of the ingredients are the same, but the amounts and the condition thereof in the finished products are not similar. The items in The Crosse & Blackwell Company beef stew, prior to cooking, consisted of beef, 25 percent, vegetables and vegetable substances, 42½ percent, and water, 32½ percent. The items in The Crosse & Blackwell Company beef soup consisted of beef stock, 15 percent, vegetables and vegetable substances, 60 percent, and water, 25 percent. The pieces of meat and vegetables in the stew are considerably larger than those in the soup. Where articles are identical as to material, but in a different condition, such identity does not constitute a similarity within the sense of the similitude provision. *Isler & Guye* v. *United States*, 11 Ct. Cust. Appls. 340, T. D. 39146; *United States* v. *Charles R. Allen, Inc.*, 37 C. C. P. A. (Customs) 110, C. A. D. 428.

The products are not similar in texture, since the stew contains more meat and larger pieces of both meat and vegetables. It also contains more liquid than the condensed soup. They are not similar in quality. The evidence establishes that the stew contains more meat and it is, therefore, more expensive, that is, of better quality than the soup. While there may be fugitive or incidental uses of the stew as soup and of the soup as a part of a stew, stew is ordinarily used as the main course of a meal, whereas soup is used as a first course. There must be a substantial sameness in the method and result of use of the two products in order to establish similitude of use. *United States* v. *B. R. Anderson & Co. and Geo. S. Bush & Co.*, 17 C. C. P. A. (Customs) 393, T. D. 43833; *Corporacion Argentina de Productores de Carnes* v. *United States*, 29 C. C. P. A. (Customs) 288,

C. A. D. 204; *Mary G. Ricks* v. *United States*, 33 C. C. P. A. (Customs) 1, C. A. D. 308.

Since the imported merchandise is not classifiable under paragraph 775, either under the provision for hash or similar forms, or the provision for soups or soup preparations, and since there is no provision in the tariff act for stews, it is properly dutiable at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article.

To that extent the protest is sustained and judgment will be rendered for the plaintiff, directing the collector to reliquidate the entry and make refund accordingly.